

FILED
FEB 0 2 2017
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| STEPHANIE ANDERSON;<br>PHETSAMONE "MAO" DARY;<br>MORIAH DEMERS; CHAD ENGELBY;<br>THOMAS ENGLISH; DEANNA<br>HOBBS; KEN JOHNSON; BRIAN<br>KRUSCHKE; JEFFREY DALLMAN,<br>KATHRYN EASTMAN; and ALAN<br>HAYDEN,<br><br>       Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>       Defendant. | Civ. No. 17-5010<br><br><br><br>**COMPLAINT** |

## PARTIES

1.    Plaintiff Stephanie Anderson is a resident of Minnesota, Plaintiff Phetsamone "Mao" Dary is a resident of Iowa, Plaintiff Moriah Demers is a resident of Minnesota, Plaintiff Chad Engelby is a resident of Minnesota, Plaintiff Thomas English is a resident of Montana, Plaintiff Deanna Hobbs is a resident of Iowa, Plaintiff Ken Johnson is a resident of Minnesota, Plaintiff Brian Kruschke is a resident of Minnesota, Plaintiff Jeffrey Dallman is a resident of Texas, and Plaintiff Kathryn Eastman is a resident of Minnesota.

2.    Wells Fargo Bank, N.A. ("Wells Fargo") is a national bank with its main office and domiciled in Sioux Falls, South Dakota, as set forth in its articles of association.

## JURISDICTION

3.      There is complete diversity of citizenship between the Plaintiffs and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

4.      This Court has original federal question jurisdiction over Plaintiffs' Fair Credit Reporting Act ("FCRA") and Racketeer Influenced and Corrupt Organizations Act ("RICO") claims as the claims arise under the Constitution, laws or treatises of the United States, pursuant to 28 U.S.C. § 1331.

5.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over state law claims in this complaint.

## VENUE

Venue is properly laid within the District of South Dakota pursuant to 28 U.S.C. § 1391 (b)(1).

## FACTUAL ALLEGATIONS FOR STEPHANIE ANDERSON

6.      Stephanie Anderson ("Anderson") was employed from 2007 to 2012 and expected to remain with Wells Fargo until retirement.

7.      Anderson was not a mortgage loan originator.

8.      Anderson was told at the time of hiring that her previous criminal conviction would not preclude her employment with Defendant.

9.      During her years at Wells Fargo she was considered an excellent employee who was valued by her manager, receiving numerous letters of recommendation and awards pertaining to her work.

10.    On February 6, 2012, she was informed in person that she was being fired on the spot, and that a criminal background check, pursuant to the SAFE Act, connected her to an alleged crime.

11.    On February 13, 2012, Wells Fargo sent a written notification to Anderson through the U.S. Mail, stating "Wells Fargo regrets to inform you that based on their hiring criteria, they are unable to consider you for further employment opportunity with its organization."

12.    Anderson was humiliated by being walked out of the building without being allowed to gather her own private belongings. Those items were subsequently sent to her.

13.    Anderson then reconfirmed that the previous criminal charge being used by Wells Fargo for her termination was dismissed.

14.    In an effort to comply with Wells Fargo's concern, she insisted that the charge be expunged from her record. The Court then completely expunged and sealed her record.

15.    Anderson informed Wells Fargo of the complete expungement, but Wells Fargo refused to restore her employment and instructed her to contact the FDIC about a waiver request, which Anderson did.

16.    The FDIC responded to Anderson's inquiry by informing her that she did not need a waiver because she was never convicted of anything.

17.    Wells Fargo still refused to reinstate Anderson's employment.

## COUNT 1
## PROMISSORY ESTOPPEL – STEPHANIE ANDERSON

18.    Plaintiff Anderson realleges the allegations contained in the paragraphs set forth above and further alleges:

19.    Prior to hiring Anderson, Wells Fargo promised her that her previous criminal conviction, which she informed them of, would not affect her employment with Wells Fargo.

20.    By giving Stephanie Anderson the assurance, then firing her over the very same criminal conviction, Wells Fargo induced Stephanie Anderson to accept the job and forego other business opportunities.

21.    Stephanie Anderson relied on Wells Fargo's promise to her detriment and to her damage.

## COUNT 2
## FRAUD AND DECEIT REGARDING STEPHANIE ANDERSON

22.    Plaintiff Anderson realleges the allegations contained in the paragraphs set forth above and further alleges:

23.    Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter her position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and act upon, Defendants misrepresentations to her detriment.

24.    Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

        a. Defendant willfully deceived Plaintiff at the time she was terminated by indicating that her criminal background rendered her ineligible to work at Wells Fargo pursuant to federal law.

4

b. Defendant deceived Plaintiff by informing her that the background check by First Advantage revealed a conviction which prohibited her employment.

c. Defendant knew that Plaintiff did not have a conviction which would render Plaintiff ineligible for hire.

d. The background check report by First Advantage specifically indicates that Plaintiff never had a criminal conviction.

e. Defendant willfully deceived Plaintiff by informing her that federal law precluded her continued employment. This statement of fact was known to be false and was used as a ruse to terminate thousands of workers.

f. Plaintiff attempted to secure a waiver from the FDIC to get her job back.

g. Plaintiff was informed by the FDIC that a waiver was impossible because she did not have a criminal conviction on her record.

h. Defendant continued to maintain that federal law prohibited Plaintiff's employment.

i. Defendant's misrepresentations induced Plaintiff to forego challenging her termination to her detriment.

j. Defendant's actions of fraud and deceit directly and proximately caused financial and emotional damages to Plaintiff.

## COUNT 3
## PUNITIVE DAMAGES - STEPHANIE ANDERSON

25.    Plaintiff Anderson realleges the foregoing allegations and further alleges:

26.    The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

27.    The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees. Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to her detriment. Defendant's conduct in deceiving and causing

5

significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

### FACTUAL ALLEGATIONS FOR PHETSAMONE "MAO" DARY:

28.     Phetsamone "Mao" Dary, ("Dary"), was employed with Wells Fargo for a period of 10 years. He was an underwriter and a valuable employee of the company.

29.     Dary was never employed as a mortgage loan originator.

30.     Prior to hiring Mr. Dary as an underwriter, Dary disclosed on his original application a criminal charge which was expunged without any deferred adjudication.

31.     Wells Fargo employees assured him at the initial hiring interview that the prior criminal charge was not a problem, and that it would not affect his employment.

32.     Dary had 10 productive and successful years of employment, prior to being fired and escorted out the door for the same minor offense that he told Wells Fargo about 10 years earlier.

33.     Dary was terminated on February 7, 2012.

34.     In an effort to rectify the situation and return to employment with Wells Fargo, Dary traveled three and a half hours back to his original home county to beg the Clerk of Courts to dig through the archives to get the paperwork showing that there was no conviction and that it had been expunged.

35.    After receiving the documentation to prove that there was no criminal conviction, Dary presented the documentation to Wells Fargo and was told that it doesn't matter and that his termination would remain in effect.

36.    At no time was Dary convicted of a disqualifying crime, yet Wells Fargo still terminated him.

37.    Dary was unemployed for two months, at which time he was forced to tap in to his retirement account just to feed his family; and for which he was heavily taxed later.

38.    Dary was not informed of the waiver process until approximately six months later, after he found a new job.

39.    It only took about three weeks for Dary to apply for and receive the waiver from the FDIC.

40.    After receiving the waiver, Dary contacted Wells Fargo and inquired about getting his job back. Wells Fargo rehired Dary in the same position previously held, but as a result of the actions of Wells Fargo, his seniority, tenure, and employment benefits accumulated were all lost regardless of his 10-year career history with them.

41.    Wells Fargo refused to reinstate him at the senior level--he was now a fresh hire.

42.    Wells Fargo did not even ask to see the FDIC waiver after it was received.

43.    Recently, to Dary's embarrassment and humiliation at a staff meeting in front of everyone, he was congratulated on his two-year anniversary

with Wells Fargo, when in reality it had been 12 years that he had devoted to Wells Fargo.

## COUNT 4
### PROMISSORY ESTOPPEL - PHETSAMONE "MAO" DARY

44.     Plaintiff Dary realleges the allegations contained in the paragraphs above and further alleges:

45.     Prior to hiring Dary, Wells Fargo promised Dary that his previous criminal charge, which he informed them of, would not affect his employment with Wells Fargo.

46.     By giving Dary this assurance, and then firing him over the very same criminal charge, Wells Fargo induced Dary to accept the job and forego other business opportunities. Dary put in ten years of capable underwriting and then Wells Fargo failed to abide by the promise given to Dary at the time of his employment.

47.     Dary relied on Wells Fargo's promise to his detriment and to his damage.

## COUNT 5
### FRAUDULENT INDUCEMENT - PHETSAMONE "MAO" DARY

48.     Plaintiff Dary realleges the allegations contained in the paragraphs set forth above and further alleges:

49.     Defendant willfully deceived Plaintiff, with the intent to induce him to take the position at Wells Fargo and invest 10 years of hard work with the understanding that he would not be terminated, suspended, or adversely affect by the criminal charge revealed to Wells Fargo at the time of hiring.

8

50.    Facts supporting the claim for fraudulently inducement include, but are not limited to the following:

> a. Wells Fargo was told of the prior criminal charges.
> b. Wells Fargo assured Dary that the criminal charge would not affect his employment at Wells Fargo.
> c. Wells Fargo knew or should have known that the charge would cause Dary to be terminated under FIRREA.
> d. Instead of disclosing this fact to Dary, Wells Fargo encouraged him to take a position with Wells Fargo. Dary then accumulated seniority and retirement pursuant to that promise.
> e. Dary relied on Wells Fargo's promise and worked for Wells Fargo for over 10 years.

51.    Defendant's fraudulent inducement directly and proximately caused damages to Plaintiff.

## COUNT 6
## FRAUDULENT CONCEALMENT - PHETSAMONE "MAO" DARY

52.    Plaintiff Dary realleges the allegations contained in the paragraphs set forth above and further alleges:

53.    Defendant willfully deceived Plaintiff, with the intent to induce him to take the position at Wells Fargo and to pass on other opportunities.

54.    By failing to inform Dary that his criminal charge would lead to his termination under FIRREA or the SAFE Act, and assuring him that the conviction would have no effect on his employment, Wells Fargo suppressed facts it was bound to disclose and gave information of other facts which are likely to mislead for want of communication of that fact.

55.    Dary relied on Wells Fargo's misrepresentations to his detriment and passed up on any and all other business opportunities to his detriment.

56.     Defendant's fraudulent concealment directly and proximately caused damages to Plaintiff.

## COUNT 7
### FRAUD AND DECEIT - PHETSAMONE "MAO" DARY

57.     Plaintiff Dary realleges the allegations contained in the paragraphs set forth above and further alleges:

58.     Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter his position to Plaintiff's injury or risk.  Plaintiff hereby relied on, and acted upon, Defendant's misrepresentations to his detriment.

59.     Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

      a.  Defendant Wells Fargo willfully deceived Plaintiff when he was terminated by indicating to him that his criminal background prevented him from working for Wells Fargo.

      b.  Wells Fargo further deceived the Plaintiff by indicating that they had the authority to fire him, based on the SAFE Act/FIRREA, when he did not have any conviction at all.

      c.  Wells Fargo continued to deceive him by informing him that he could not be reinstated with Wells Fargo, even though he did not have a conviction and could not receive a waiver because the FDIC informed him that there was nothing that could be waived.

      d.  Wells Fargo continued to deceive Dary by informing him that the alleged security screening by First Advantage revealed a conviction which prohibited him from being employed by Wells Fargo any longer.

      e.  Wells Fargo specifically contained in their file a report by First Advantage which did not indicate any conviction of any crime which would prevent Dary from being employed under the SAFE Act or any other act claimed by the Defendant.

f.  On February 13, 2012, Wells Fargo sent a written notification to Dary through the U.S. Mail, stating "Wells Fargo regrets to inform you that based on their hiring criteria; they are unable to consider you for further employment opportunity with its organization." Such representation is absolutely false given the fact that Dary was never convicted of any crime that would make him ineligible for employment.

g.  Additionally, Wells Fargo failed to confirm any conviction that would make him ineligible under the SAFE Act/or FIRREA. Such representation to Dary is intentional, deceptive, willful, and fraudulent.

h.  Defendant's misrepresentations induced Plaintiff to forego challenging his termination to his detriment.

i.  Defendant's actions of fraud and deceit directly and proximately caused financial and emotional damages to Plaintiff.

### COUNT 8
### PUNITIVE DAMAGES - PHETSAMONE "MAO" DARY

60.   Plaintiff Dary realleges the foregoing allegations and further alleges:

61.   The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

62.   The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and thousands of other Wells Fargo employees.  Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to his detriment.  Defendant's conduct in deceiving and causing significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

## FACTUAL ALLEGATIONS FOR JEFFREY DALLMAN:

63.    Jeffrey Dallman ("Dallman") was employed for a period of 12 years prior to his termination in May 23, 2012. Throughout his years of employment he was given outstanding reviews and compliments for his performance and activism as an employee of Wells Fargo. Dallman was a business analyst at the time that he was wrongfully fired.

64.    Dallman passed all background checks by Wells Fargo at the time of his hiring. He followed that with 12 years of outstanding performance and awards from Wells Fargo.

65.    At the time of hiring, Wells Fargo did a background check and were unconcerned because the single incident criminal violation in his record was more than 10 years prior to the original hiring. At the time of firing, the conviction was 23 years old.

66.    At the time of the original application, the conviction was not disclosed to Wells Fargo because it happened more than 10 years prior to the original application. It was his understanding that disclosure of a conviction older than 10 years was not necessary.

67.    Prior to his termination, Dallman approached management at Wells Fargo to inquire whether or not his 23-year-old criminal conviction could result in any problems to his employment.

68.    Mr. Dallman was told by his superiors that nothing needed to be, or could be, done regarding the conviction.

69.   Wells Fargo subsequently fired him based upon a conviction that took place 23 years ago.

70.   Dallman had served as an Business Analyst for Wells Fargo for more than 10 years.

71.   Wells Fargo mentioned to Dallman, upon termination, about the FDIC waiver process and indicated to him that he was on his own to do it and that they would not assist him. Months prior to the termination, Dallman approached Wells Fargo regarding whether anything could be done. At that time he was deceived by Wells Fargo and was told there was nothing he could do. If he had been told about the waiver process, he could have applied for the waiver and had it approved prior to any termination.

72.   By the time Dallman's termination took place there were so many former Wells Fargo employees in the same situation that the waiver took many months to secure.

73.   Waiver was received from the FDIC and presented to Wells Fargo. At that time Wells Fargo indicated that it would not rehire him.

74.   As a single working father of five, the termination came as a devastating blow. He was forced to take on financial hardship by moving his family to Texas to secure new employment.

75.   With his outstanding qualifications, he was hired in the same field by a different mortgage company.

## COUNT 9
## FRAUD AND DECEIT - JEFFREY DALLMAN

76.    Plaintiff Dallman realleges the allegations contained in the

paragraphs set forth above and further alleges:

77.    Defendant Wells Fargo willfully deceived Plaintiff, through

representations it knew to be untrue, or recklessly made, with the intent to

induce Plaintiff to alter his position to Plaintiff's injury or risk.  Plaintiff hereby

relied on, and acted upon, Defendant's misrepresentations to his detriment.

78.    Particular facts supporting Plaintiff's allegations of fraud and

deceit are as follows:

  a. Defendant willfully deceived Plaintiff by doing an initial
     background check and informing Dallman that his 23-year-old
     criminal conviction would not impede his employment with
     Wells Fargo.
  b. Defendant willfully deceived the Plaintiff by performing a
     background check at the time of hire and hiring him for more
     than 12 years, of which he had outstanding performance and
     then firing the Plaintiff based on the 23-year-old conviction.
  c. Wells Fargo fraudulently concealed from Mr. Dallman that he
     could have initiated a waiver process and received his waiver
     prior to any termination.
  d. Dallman was deceived by the employees of Wells Fargo when
     they told him that there was "nothing that needed to be or could
     be done."
  e. Wells Fargo knew or should have known that the waiver process
     was available to Dallman and the waiver should been have
     immediately processed. Dallman's conviction was 23-years-old,
     and as a result, was beyond the time period set forth by the
     states concerning lookback on conviction.
  f. Wells Fargo intentionally and recklessly assured Dallman that
     nothing could be done when the truth of the matter was that a
     waiver could have been applied for and received prior to any
     termination.

14

g.  Wells Fargo failed to follow the Federal statute regarding Fair
    Credit Reporting Act; Wells Fargo did this intentionally and
    willfully while they fired thousands of workers under the guise
    that they did not qualify as employees under the SAFE Act or
    under FIRREA. Wells Fargo intentionally used the safe act to
    indicate to employees that they "must" fire employees with
    previous convictions.

h.  Wells Fargo intentionally and fraudulently failed to comply with
    the requirements of the Fair Credit Reporting Act.

i.  Wells Fargo intentionally, willfully, and maliciously entered in to
    a plan to fire and terminate thousands of employees in order to
    save expenses for the company all to the detriment of these
    employees.

j.  Defendant's actions of fraud and deceit directly and proximately
    caused financial and emotion damages to Plaintiff.

### COUNT 10
### PUNITIVE DAMAGES – JEFFREY DALLMAN

79.    Plaintiff Dallman realleges the contained in the paragraphs set

forth above foregoing and further alleges:

80.    The conduct of Defendant and its directors, managers, employees,

agents, and subcontractors described above, constitutes fraud.

81.    The representations made by Defendant were false and untrue

and were material to the conduct and corporate operations which resulted in

damage to Plaintiff and hundreds of other Wells Fargo employees.  Wells Fargo

made representations which it knew or should have known would be acted on

by Plaintiff to his detriment.  Defendant's conduct in deceiving and causing

significant damage to Plaintiff was carried out in such a willful, reckless, and

self-serving manner as to entitle Plaintiff to an award of punitive damages.

## FACTUAL ALLEGATIONS FOR MORIAH DEMERS:

82.    Moriah Demers, ("Demers"), was employed with Wells Fargo from 2009 until October 16, 2012. Prior to employment, in 2009, she filled out an employment application dated 7/14/2009. At that time she informed Wells Fargo that she had been involved in a crime of dishonesty prior to her employment with Wells Fargo. She indicated on the application that when she was 18, she was charged with a gross misdemeanor.

83.    She also indicated that on the application she had not been convicted of any felony within the past 10 years. Wells Fargo completed the background check and proceeded to hire Demers. Demers was an excellent employee for Wells Fargo until she was terminated on October 16, 2012, for the misdemeanor conviction that she had previously disclosed through her prior application.

84.    In fact, not only on her computer application, but also on the background investigation promoted by Wells Fargo she disclosed that she had been convicted of a gross misdemeanor in Minnesota. She was hired following the execution of the computer application and the background investigation authorization.

85.    She was informed that the conviction would have no bearing on her employment and she was subsequently hired to work at Wells Fargo for several years prior to her termination.

86.    She received, on October 16, 2012 a termination notice indicating that "as a result of the background screening, you are ineligible for

employment with Wells Fargo and your employment will be terminated October 16, 2012."

87.    She was not informed prior to her termination that the waiver from the FDIC, could have been received at the time she initially told Wells Fargo regarding the conviction or at any subsequent time to that.

88.    She was not given adequate notice prior to termination so that she could go get her own waiver or have the bank process a waiver application.

## COUNT 11
## PROMISSORY ESTOPPEL – MORIAH DEMERS

89.    Plaintiff Demers realleges the allegations contained in the paragraphs above and further alleges:

90.    Prior to hiring Demers, Wells Fargo promised Demers that her previous criminal conviction, which he informed them of, would not affect her employment with Wells Fargo.

91.    By giving Demers this assurance, and then firing her over the very same criminal conviction, Wells Fargo did induce Demers to accept the job and forego other business opportunities. Demers put in years of service and then Wells Fargo failed to abide by the promise given to Demers at the time of his employment.

92.    Demers relied on Wells Fargo's promise to her detriment and to her damage.

## COUNT 12
## FRAUD AND DECEIT - MORIAH DEMERS

93.     Plaintiff Demers realleges the allegations contained in the paragraphs set forth above and further alleges:

94.     Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter her position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and act upon, Defendant's misrepresentations to her detriment.

95.     Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

      a. At the time of Demers initial hiring, Wells Fargo failed to inform her that she was ineligible to be employed by Wells Fargo at that time.

      b. Wells Fargo failed to inform her that she could get a waiver which would make her eligible for Wells Fargo.

      c. Wells Fargo intentionally and willfully hired her contrary to the dictates of FIRREA, and then when it was convenient to terminate her, Wells Fargo discharged her using the disclosed conviction as a reason to do so.

      d. Demers informed Wells Fargo multiple times of the incident regarding the theft conviction, giving Wells Fargo ample opportunity to indicate to her that she was not eligible for employment. Instead it did employ her, did advance her and then terminated her indicating there was a violation of the SAFE Act and FIRREA and that she was no longer eligible to work for Wells Fargo.

      e. Wells Fargo failed to gain consent from the FDIC to hire her in the first place.

      f. After the mass firings by Wells Fargo, Demers proceeded to make an application to get a waiver concerning the aforementioned crime. It took her more than 6 months to get the waiver given the fact that so many were making applications.

g. Upon her return to Wells Fargo, Demers asked if Wells Fargo would reinstate her years of service, that request was denied. Wells Fargo refused to reinstate her years of service and would start her over at day 1.

h. On October 16, 2012 she was informed that "you are ineligible for employment with Wells Fargo and your employment will be terminated October 16, 2012." That representation is inaccurate and contrary to representations made to her and the fact that she was employed for a number of years prior to the most recent screening.

i. In fact screening had been done prior to this and that she was accepted as an employee to Wells Fargo.

j. That if "she was ineligible for employment with Wells Fargo" on October 16, 2012, the actions of hiring or following a background investigation in 2009 were improper, deceptive and a willful deceiving of Demers, in that by her hiring she is being told that she is eligible for employment with Wells Fargo and in fact did work for Wells Fargo for a number of years.

k. As a result of the termination, she lost all benefits including retirement benefits, seniority, and tenure.

l. She has been damaged by loss of tenure, seniority, and 401K.

## COUNT 13
## PUNITIVE DAMAGES – MORIAH DEMERS

96.    Plaintiff Demers realleges the allegations set forth in the paragraphs above  and further alleges:

97.    The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

98.    The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees.  Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to her detriment.  Defendant's conduct in deceiving and causing

19

significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

**FACTUAL ALLEGATIONS FOR CHAD ENGELBY:**

99.    Mr. Engelby, ("Engelby"), was employed by Wells Fargo for a period of approximately 8 years, as a loan document specialist.

100.   The manager of Wells Fargo approached Engelby regarding his background check and claimed that he failed the background check.

101.   The alleged claim was related to a criminal charge that had been dismissed from his record. As a result of the dismissal, there was no criminal record that remained.

102.   There was conversation with Wells Fargo HR indicating that Engelby would provide the documentation of the dismissal of the criminal charge regarding the issue that occurred in the early 90's.  Wells Fargo refused to reinstate Engelby even though Engelby did not have a criminal record regarding this charge in the early 90's because it had been completely expunged.

103.   Human Resources told Engelby to contact the FDIC. At that time Engelby was instructed that he needed a bank to sponsor you in securing a waiver. Wells Fargo refused to sponsor Engelby regarding the waiver. Wells Fargo further indicated to Engelby that he would only be allowed 1 to 3 weeks to secure the waiver on his own.

104.   Engelby was informed by FDIC that it would take 3 to 6 months to get the waiver.

105.  Even though this alleged charge and record had been dismissed, Wells Fargo refused to allow Engelby to return to employment with Wells Fargo.

106.  As a result of the termination, Engelby began hunting for employment. Engelby then found employment with a mortgage company as a mortgage processor.

107.  At no time did the mortgage company require any waiver given the fact that he did not have a criminal record regarding this charge in the early 90's. The charge occurred when he was 18 years old and had been fully dismissed. Wells Fargo did not care and proceeded to terminate him, damaging his reputation and end his career with Wells Fargo.

## COUNT 14
## FRAUD AND DECEIT - CHAD ENGLEBY

108.  Plaintiff Engelby realleges the allegations set forth in the paragraphs above  and further alleges:

109.  Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter his position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and act upon, Defendant's misrepresentations to his detriment.

110.  Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

a.  Defendant willfully deceived Plaintiff at the time he was terminated by indicating that his criminal background rendered him ineligible to work at Wells Fargo pursuant to federal law.
b.  Defendant deceived Plaintiff by informing him that the background check by First Advantage revealed a criminal conviction which prohibited his employment.

21

c. On February 6, 2012, Wells Fargo, through the mail, informed Engelby that he was terminated because he was "ineligible for employment with Wells Fargo." Such representation was willfully and intentionally done by Wells Fargo knowing full well that the Plaintiff was eligible to continue with Wells Fargo.

d. Wells Fargo was well aware of the fact that the criminal charge in 1994 had a disposition that it was a "diversion" with a de novo program for one year. On August 23, 1995 the case was dismissed because the conditions were met. As a result there is no conviction of Engelby which could lead Wells Fargo to claim that he was "ineligible for employment with Wells Fargo."

e. Additionally, Wells Fargo knew that this charge did not result in a conviction and was older than 10 years and as a result should not be considered in any respect by Wells Fargo as it concerned Engelby.

f. Defendant knew that Plaintiff did not have any conviction, much less a conviction which would render Plaintiff ineligible for hire.

g. The background check report by First Advantage specifically indicates that Plaintiff never had a conviction.

h. Defendant willfully deceived Plaintiff by informing him that federal law precluded his continued employment when the case was completely dismissed in 1995. This statement of fact was known to be false and was used as a ruse to terminate thousands of workers.

i. Defendant's misrepresentations induced Plaintiff to forego challenging his termination to his detriment.

j. Defendant's actions of fraud and deceit directly and proximately caused financial damages to Plaintiff.

**FACTUAL ALLEGATIONS FOR THOMAS ENGLISH**

111. Prior to employment with Wells Fargo, Mr. English, ("English"), was independently successful with his own business in the Mortgage industry. Wells Fargo repeatedly attempted to recruit him over the course of four years which were consistently declined.

22

112.    After being recruited for 6-7 years, eventually English agreed to
work for Wells Fargo.

    a.  English was a highly successful employee when he was abruptly
        fired over a criminal conviction that occurred 15 to 17 years
        prior (1995) for which he received an expungement.

    b.  English believed it was a misunderstanding and assured Wells
        Fargo he would show them the criminal conviction had been
        expunged/dismissed and that there was no record. Wells Fargo
        was unreceptive and did not care.

    c.  English called the County officials where the incident occurred
        and confirmed that the record was expunged and there
        shouldn't be any remaining implication.

    d.  Wells Fargo did not care that the County officials and former
        county attorney where the incident occurred indicated that the
        record was expunged. Wells Fargo claimed that Federal
        Regulation that the expungement made no difference.

    e.  At no time was he informed by Wells Fargo that an FDIC waiver
        could be obtained; English found out about the waiver process
        approximately 2 years after he had left the banking industry
        and after he was fired.

    f.  As a result of the wrongful termination by Wells Fargo and the
        deception regarding the law, English lost approximately half his
        income and his home.

    g.  Wells Fargo's actions affected English both economically and
        emotionally. It was a devastating financial hit, and English's
        good name and professional reputation was harmed by Wells
        Fargo.

## COUNT 15
## FRAUD AND DECEIT – THOMAS ENGLISH

113.    Plaintiff English realleges the allegations contained in the
paragraphs set forth above and further alleges:

114.    Defendant willfully deceived Plaintiff, through representations it
knew to be untrue, or recklessly made, with the intent to induce Plaintiff to

alter his position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and

act upon, Defendants misrepresentations to his detriment.

115.  Particular facts supporting Plaintiff's allegations of fraud and

deceit are as follows:

   a. Defendant willfully deceived Plaintiff at the time he was
      terminated by indicating that his criminal background rendered
      him ineligible to work at Wells Fargo pursuant to federal law.
   b. Defendant deceived Plaintiff by informing him that the
      background check by First Advantage revealed a conviction
      which prohibited his employment.
   c. Defendant knew that Plaintiff did not have a disqualifying
      conviction, as Plaintiff's conviction occurred 15 years prior to
      his hiring and had been expunged. In fact the records had been
      completely sealed. English had received a "complete
      expunction." Because the records were sealed, Wells Fargo had
      no idea what the actual charges ever were which pertained to
      English.
   d. Defendant willfully deceived Plaintiff by informing him that
      federal law precluded his continued employment.  This
      statement of fact was known to be false and was used as a ruse
      to terminate thousands of workers.
   e. Defendant's misrepresentations induced Plaintiff to forego
      challenging his termination to his detriment.
   f. Defendant's actions of fraud and deceit directly and proximately
      caused financial damages to Plaintiff.

## COUNT 16
## PUNITIVE DAMAGES – THOMAS ENGLISH

116.  Plaintiff English realleges the allegations contained in the previous

paragraphs and further alleges:

117.  The conduct of Defendant and its directors, managers, employees,

agents, and subcontractors described above, constitutes fraud.

118.  The representations made by Defendant were false and untrue

and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees. Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to his detriment. Defendant's conduct in deceiving and causing significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

## FACTUAL ALLEGATIONS FOR DEANNA HOBBS:

119. On the same day that Deanna Hobbs, ("Hobbs") received a job promotion, and a 5% increase in pay, she was fired.

120. On May 23, 2012, Hobbs was informed that as a result of background screening she was ineligible for employment with Wells Fargo.

121. Hobbs began working for Wells Fargo as a collections specialist then moved to Financial Support where she processed checks. She became experienced and had ability in both departments and became a liaison between the two departments and personally built most of the new procedures.

122. Prior to her permanent employment with Wells Fargo she underwent a criminal background check and the expunged offense never came up.

123. Hobbs was working for Wells Fargo for approximately 4 years when she was abruptly terminated with very little explanation and walked out of the building in humiliating manner without being allowed to collect her personal belongings. Wells Fargo was asked why she was being fired, given the fact that the conviction had been expunged, and Wells Fargo responded they didn't

know what offense or what date it occurred. Wells Fargo couldn't show her the records.

124.   Never at any time during or after the termination did Wells Fargo inform Hobbs about the FDIC waiver that was available.

125.   As a result of the firing, Hobbs lost all the benefits from 4 years of employment with Wells Fargo. As a result of the firing, she was forced to deplete her 401K account to support herself and pay her rent.

126.   Hobbs called Wells Fargo for approximately 8 months trying to get her personal belongings returned to her before they were finally shipped to her damaged and broken.

127.   Hobbs was on unemployment for over a year.

128.   May 23, 2012, Wells Fargo informed Hobbs that as a result of a background screening "you are ineligible for employment with Wells Fargo and your employment has been terminated 05-23-2012." The First Advantage group, hired by Wells Fargo to screen employees, did not detect any criminal history in violation of any criminal act in any county examined.

129.   On May 30, 2012, Defendant Wells Fargo requested that First Advantage write a letter to Hobbs indicating that Wells Fargo regrets to inform you that based on the hiring criteria they are unable to consider you for further employment or opportunities with this organization.

130.   Based on the confidential report of First Advantage on behalf of Wells Fargo, Wells Fargo relied on absolutely nothing that would indicate Hobbs violated any law in any county checked except a claim that "during our

investigation to the Boone County Circuit Court, we found that charges on the finger print results for the arrest date 9-21-04 pertained to an expunged case."

131.  Wells Fargo has no record, did not discover any record, and did not determine that any records exist that would disqualify Hobbs from employment.

**COUNT 17**
**FRAUD AND DECEIT – DEANNA HOBBS**

132.  Plaintiff Hobbs realleges the allegations contained in the previous paragraphs and further alleges:

133.  Plaintiff willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter her position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and act upon, Defendant's misrepresentations to her detriment.

134.  Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

   a. Defendant willfully deceived Plaintiff at the time she was terminated by indicating that her criminal background rendered her ineligible to work at Wells Fargo pursuant to federal law.
   b. Defendant deceived Plaintiff by informing her that the background check by First Advantage revealed a conviction which prohibited her employment.
   c. Defendant knew that Plaintiff did not have any conviction, much less a conviction which would render Plaintiff ineligible for hire.
   d. The background check report by First Advantage specifically indicates that Plaintiff never had a conviction.
   e. Defendant willfully deceived Plaintiff by informing her that federal law precluded her continued employment.  This

      statement of fact was known to be false and was used as a ruse to terminate thousands of workers.

  f.  Plaintiff attempted to secure a waiver from the FDIC to get her job back.

  g.  Plaintiff was informed by the FDIC that a waiver was impossible because she did not have a conviction on her record.

  h.  Defendant continued to maintain that federal law prohibited Plaintiff's employment.

  i.  Defendant's misrepresentations induced Plaintiff to forego challenging her termination to her detriment.

  j.  Defendant's misrepresentation convinced Hobbs she was no longer eligible to work in any FDIC insured bank.

  k.  Defendant's actions of fraud and deceit directly and proximately caused financial damages to Plaintiff.

## COUNT 18
## PUNITIVE DAMAGES – DEANNA HOBBS

135.  Plaintiff Hobbs realleges the foregoing allegations and further alleges:

136.  The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

137.  The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees.  Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to her detriment.  Defendant's conduct in deceiving and causing significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

## FACTUAL ALLEGATIONS FOR KEN JOHNSON:

138.  In 2007 Mr. Johnson, ("Johnson"), was hired by Wells Fargo to work in the bank. He did not work in mortgage lending.

139.  In 2011 First Advantage, on behalf of Wells Fargo, performed a pre-employment/security screening.

140.  It was determined through First Advantage that Johnson plead guilty to a criminal charge in 1979.  The court entered a stay of imposition of sentence and the charge was eventually dismissed.

141.  Wells Fargo used Johnson's 1979 arrest as the sole basis for his termination.  Wells Fargo claimed that Johnson was not eligible for hire pursuant to Section 19 of the Federal Deposit Insurance Act.

142.  In an effort to clear the matter Johnson contacted the FDIC to apply for a waiver.  It was determined by the FDIC that no waiver could be obtained given the fact that there was never a conviction.

143.  In fact, the FDIC through Dwayne Curtis, Counsel, Legal Division of the Federal Deposit Insurance Corporation, indicated on April 26, 2011 that the court entered a stay of imposition of sentence and a probation order which was successfully completed on September 9, 1984. The charges were then dismissed and no sentence was ever imposed as a result of this offense.  Mr. Curtis indicated that Section 19 restrictions "do not present a legal impediment to your employment at any federally incurred deposit intuition and no application for consent in necessary."

144.   In spite of being informed by the FDIC that Section 19 Restrictions do not apply to him and that no application for waiver was necessary, Wells Fargo refused to reinstate or rehire Johnson.  Three months after a promotion was given to Johnson into Wells Fargo mortgage department, he was fired regarding an incident that occurred some 30 years prior and did not ever result in a conviction.

145.   After he was terminated, he requested resuming his job with Wells Fargo in the capacity that had nothing to do with mortgages but Wells Fargo refused.

146.   Johnson was not informed about the FDIC waiver process by Wells Fargo.

147.   Once he heard about the FDIC waiver process, and contacted the FDIC, he was informed that he did not need a waiver since he did not have a conviction.

148.   As a result of the termination, Johnson found another job making substantially less income than he would of making on commission at Wells Fargo.

**COUNT 19**
**FRAUD AND DECEIT – KEN JOHNSON**

149.   Plaintiff Johnson re-alleges the allegations contained in the paragraphs set forth above and further alleges:

150.   Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to

30

alter his position to Plaintiff's injury or risk. Plaintiff hereby did rely on, and act upon, Defendant's misrepresentations to his detriment.

151. Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

    a. The actions by Wells Fargo were willful, intentional and deceptive claiming that Johnson was not eligible to be an employee of Wells Fargo based on Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. § 1829.

    b. Wells Fargo intentionally and purposely deceived Johnson claiming that he somehow was ineligible as a result of violating this act.

    c. Wells Fargo knew perfectly well that Johnson was eligible for employment; and Well Fargo's stated reason reason for termination was an intentional misrepresentation.

    d. Defendant's misrepresentations induced Plaintiff to forego challenging his termination to his detriment.

    e. Defendant's actions of fraud and deceit directly and proximately caused financial damages to Plaintiff.

## COUNT 20
## PUNITIVE DAMAGES – KEN JOHNSON

152. Plaintiff Johnson realleges the allegations contained in the paragraphs set forth above and further alleges:

153. The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

154. The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees. Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to his detriment. Defendant's conduct in deceiving and causing

significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

## FACTUAL ALLEGATIONS FOR BRIAN KRUSCHKE:

155.   Brian Kruschke, ("Kruschke"), was employed by Wells Fargo for many years.

156.   Awards were given to Kruschke as an employee at Wells Fargo as follows: Sales Star Winner; Top of The Line Performer; Team Member Incentive Award; Monthly Motivator Award; Service Excellence Nominee; Outstanding Leadership in WOW Performance; Star Manager Award; Shared Success Award; ICP Performance Award; Sales & Service Excellence Champion.

157.   A background investigation was done in October of 2006. Following the background investigation Kruschke was hired by Wells Fargo and began employment with Wells Fargo, N.A.

158.   When first employed by Wells Fargo, Kruschke was asked about any convictions in the background dating back 7 years. Kruschke fully disclosed a 7 year old conviction on his record.

159.   Wells Fargo HR confirmed that the conviction he disclosed had already come up, but instructed that he was a good guy and not to worry, Wells Fargo then hired him.

160.   In 2011, as Branch Manager of Wells Fargo location, he started hearing about Wells Fargo's new background screening plan, allegedly involving the SAFE Mortgage Act. Kruschke had no reason to be concerned and had all of the employees screened. At the time of this screening, Kruschke was

making about $80,000 a year. He had applied for and expected to become the Branch Manager of the Level V, Minneapolis Wells Fargo. The new position would have ranged from $120,000.00 a year to $150,000.00 a year.

161.   Kruschke was informed that he could not come back to work. Wells Fargo claimed that this was because of the SAFE Act and FIRREA.

162.   Kruschke did not write mortgages. Wells Fargo claimed that he fell under the SAFE Act regulations and that he was responsible for the productivity and compliance of your banking staff.

163.   Kruschke asked if he could work in another department and was told that he could not work in any department and that he was "unhirable."

164.   Wells Fargo denied unemployment compensation and Mr. Kruschke spent the next 2-3 weeks fighting to get it. He did receive unemployment compensation.

165.   Wells Fargo justified its denial of unemployment by stating that Kruschke had lied about his background because it was an unreported incident when he was 19. Kruschke replied that Wells Fargo had asked about the prior 7 years which did not include the incident when he was 19. In addition Kruschke had disclosed the only record in those prior 7 years. Wells Fargo had screened Kruschke at that time and had cleared him regarding the incident.

166.   Following the termination, Wells Fargo kept all of his vacation time, which was substantial because he rarely took vacations.

167.   As a result of the actions by Wells Fargo, Kruschke was forced to cash out his 401K just to make ends meet during his unemployment. He ended up taking a double tax hit on the cash out.

## COUNT 21
### FRAUD AND DECEIT - BRIAN KRUSCHKE

168.   Plaintiff Kruschke realleges the allegations contained in the paragraphs set forth above and further alleges:

169.   Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter his position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and act upon, Defendant's misrepresentations to his detriment.

170.   Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

> a. Defendant Wells Fargo willfully deceived Plaintiff when he was terminated by indicating to him that the criminal background prevented him from working for Wells Fargo.
> b. Kruschke had completely and fully disclosed to Wells Fargo a seven year old incident on his record. He was told by Wells Fargo that he did not need to worry, and then Wells Fargo hired him.
> c. Wells Fargo then reneged on their promise that he was not to worry, that it would not be a problem. Wells Fargo intentionally, willfully and recklessly promised Kruschke that the prior conviction would not affect his employment eligibility. Wells Fargo wrongfully indicated to Kruschke that he was ineligible to be employed by Wells Fargo.
> d. Wells Fargo intentionally deceived Kruschke by failing to inform him both when he was first employed and later, that a waiver was available to be applied for so that he would not be terminated because of alleged violations of 12 U.S.C § 1829, Section 19.

34

   e. Brian Kruschke reasonably relied on the representations by Wells Fargo that the prior conviction would have no affect whatsoever on his employment.

   f. Defendant's misrepresentations induced Plaintiff to forego challenging to his termination to his detriment.

   g. Defendant's actions of fraud and deceit directly and proximately caused financial damages to Plaintiff.

**COUNT 22**
**PUNITIVE DAMAGES – BRIAN KRUSCHKE**

171.   Plaintiff Kruschke realleges the allegations contained in the paragraphs set forth above and further alleges:

172.   The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

173.   The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees.  Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to his detriment.  Defendant's conduct in deceiving and causing significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

**FACTUAL ALLEGATIONS FOR KATHRYN EASTMAN:**

174.   Kathryn Eastman, ("Eastman"), was employed by Wells Fargo on two separate occasions.

175.   Eastman was first hired to work in the Wells Fargo Reverse Mortgages area.  She worked in that capacity for roughly one year.  She was then let go when the Reverse Mortgage Department was closed.

35

176. Eastman was then rehired as a loan processor.

177. Eastman was fired by Wells Fargo in March of 2012 under the auspices of the SAFE Act and FIRREA.

178. Wells Fargo claimed that she was no longer eligible to be employed because of a conviction for theft of a hairbrush, thirty one years prior to termination.

179. Wells Fargo knew about the hairbrush conviction both times she was hired. Eastman disclosed the incident orally and on her employment application. Eastman was told by her supervisor, Bob Austin, that she did not need to worry about the hairbrush incident that took place in 1982, and that Wells Fargo "was not looking for things like that."

180. Eastman underwent three separate background checks, not one revealed a conviction.

181. Eastman was given a false expectation of continued employment when she was told by Wells Fargo that they "are not looking for things like that" and that she did not need to be worried about her hairbrush conviction.

182. At no point was she informed about the waiver process so that she could apply with the FDIC and be in a position that she was not subject to termination by Wells Fargo for the very crime that she informed them about.

183. At no point did Wells Fargo offer to sponsor Eastman in the waiver process, and further, led her to believe that without a sponsor she would not receive a waiver.

## COUNT 23
## PROMISSORY ESTOPPEL – KATHRYN EASTMAN

184.  Plaintiff Eastman realleges the allegations contained in the paragraphs above and further alleges:

185.  Prior to hiring Eastman, Wells Fargo promised Eastman that her previous criminal conviction, which she informed them of, would not affect her employment with Wells Fargo.

186.  By giving Eastman this assurance, and then firing her over the very same criminal conviction, Wells Fargo did induce Eastman to accept the job and forego other business opportunities.  Eastman put in years of service and then Wells Fargo failed to abide by the promise given to Eastman at the time of her employment.

187.  Eastman relied on Wells Fargo's promise to her detriment and to her damage.

## COUNT 24
## FRAUD AND DECEIT - KATHRYN EASTMAN

188.  Plaintiff Eastman realleges the allegations contained in the paragraphs set forth above and further alleges:

189.  Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter her position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and act upon, Defendant's misrepresentations to her detriment.

190.  Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

a. Defendant Wells Fargo willfully deceived the Plaintiff when she was terminated by indicating to her that her criminal background prevented her from working for Wells Fargo.

b. Wells Fargo further deceived the Plaintiff by indicating they had the authority to fire her based on the SAFE Act and FIRREA.

c. Wells Fargo continued to deceive her by informing her that she could not be reinstated with Wells Fargo.

d. Wells Fargo continued to deceive her by telling her that she had nothing to worry about, that Wells Fargo was not looking for things like that, instead of informing her that she could receive a waiver from the FDIC.

e. Wells Fargo continued to deceive her by claiming that she had a conviction which prohibited her from being employed by Wells Fargo.

f. Wells Fargo continued to claim that she had a criminal conviction that was disqualifying even though the Wells Fargo/First Advantage report does not reveal such a conviction.

g. Wells Fargo continued to deceive her when they indicated that they could look back farther than 7 to 10 years regarding criminal proceedings.

h. Wells Fargo continued to deceive her that she was told, through the mail, that she was ineligible for employment with Wells Fargo.

i. The notice from Wells Fargo dated March 5, 2012, was deceptive for the following reasons:

1. The notice of March 5, 2012, stated the decision to terminate Kathryn "was based in part on information contained in the consumer report Wells Fargo received from First Advantage."

2. The report by First Advantage, which is 4 pages long, specifically indicates that following county criminal search which was developed from fingerprints, resulted in "no records found" and on page 3 of First Advantage report states "Searched EWS for Kathryn Eastman. No records were found for Kathryn Eastman."

3. As a result the Adverse Action Notification from Wells Fargo relying on First Advantage report indicates that Wells Fargo found no reports.

j. Due to Wells Fargo's misleading and deceitful actions, Ms. Eastman failed to challenge her termination or apply for a waiver from the FDIC because she was told she needed an institution sponsor and Wells Fargo would not act as a sponsor.

## COUNT 25
## PUNITIVE DAMAGES – KATHRYN EASTMAN

191.   Plaintiff Eastman realleges the allegations contained in the paragraphs set forth above and further alleges:

192.   The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

193.   The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees.   Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to her detriment.   Defendant's conduct in deceiving and causing significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

## FACTUAL ALLEGATIONS FOR ALAN HAYDEN

194.   Alan Hayden, ("Hayden"), was employed by Wells Fargo from 2008 to 2012.

195.   He began as a Loan Servicing Specialist in Wells Fargo call center, speaking to individuals about home loans; then went to the written customer contact department; his positions did not involve the handling of money.

196.   He had just earned a promotion to Loan Document Analyst and moved to another Wells Fargo location, when he was fired.

39

197.    At the time of his initial hiring, he informed Wells Fargo of a misdemeanor theft conviction many years prior to hiring. With Wells Fargo's full knowledge of the incident, he was subjected to a background check which dated back 7 years and which he passed. As a result he was hired.

198.    His employment record for Wells Fargo was highly commendable and always merited praise from his managers and his years at Wells Fargo he received merit increases.

199.    After being subjected to further scrutiny in 2012 and fingerprinting, the records at First Advantage divulged he did in fact have a misdemeanor theft as he had previously divulged. Within two months of his most recent promotion, he was fired because of his misdemeanor conviction that he specifically brought to Wells Fargo's attention prior to the original hiring.

200.    Hayden was terminated on May 8, 2012. He was not allowed to return to his desk to collect his personal belongings, but instead escorted out of the building. Things were later mailed to him.

201.    Wells Fargo then fought unemployment compensation but at a subsequent hearing, unemployment was awarded to Hayden.

202.    Never at any time before, during, or after termination did Wells Fargo advise him of the FDIC Waiver. Following the termination, Hayden was unemployed for approximately a year, during which time he had to move to another state, and his wife went back to school.

203.   After four faithful years with Wells Fargo, he was making $17.00 per hour when he was fired. He took a substantial pay cut when he began to work for State Farm Insurance after a period of unemployment.

## COUNT 26
## PROMISSORY ESTOPPEL

204.   Plaintiff Hayden realleges the allegations contained in the paragraphs above and further alleges:

205.   Prior to hiring Hayden, Wells Fargo promised Hayden that his previous criminal conviction, which he informed them of, would not affect his employment with Wells Fargo.

206.   By giving Hayden this assurance, and then firing him over the very same criminal conviction, Wells Fargo did induce Hayden to accept the job and forego other business opportunities.  Hayden put in years of service and then Wells Fargo failed to abide by the promise given to him at the time of his employment.

207.   Hayden relied on Wells Fargo's promise to his detriment and to his damage.

## COUNT 27
## FRAUD AND DECEIT – ALAN HAYDEN

208.   Plaintiff Hayden realleges the allegations contained in the paragraphs set forth above and further alleges:

209.   Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to

alter his position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and

act upon, Defendant's misrepresentations to his detriment.

210.  Particular facts supporting Plaintiff's allegations of fraud and

deceit are as follows:

a. Wells Fargo intentionally misrepresented to Hayden that his prior theft conviction would have no effect on his employment at Wells Fargo.

b. Hayden relied on Wells Fargo's misrepresentations to his detriment.

c. Wells Fargo failed to inform Hayden that if he applied for a waiver with the FDIC that he would have no issues that would give rise to his termination.

d. Wells Fargo willfully deceived Hayden when he was terminated by indicating to him that his criminal conviction prevented him from working for Wells Fargo. Wells Fargo knew and willfully deceived him by failing to inform him that a waiver could be obtained throughout his employment with Wells Fargo so that he could continue with Wells Fargo.

e. Wells Fargo deceived Hayden at the time they hired Hayden by informing him that he could be hired with his theft conviction instead of recommending to Hayden that he get a waiver prior to being hired by Wells Fargo.

f. Wells Fargo continued to deceive him by informing him that he could not be reinstated with Wells Fargo if a waiver was obtained.

g. Wells Fargo deceived Hayden by informing him that they needed to consider misdemeanor convictions that are older than seven years or older than ten years.

h. Given the fact that Wells Fargo represented to Hayden that his conviction would be of no consequence, Wells Fargo deceived him by failing to assist and promote a waiver from the FDIC, which he could have easily attained with such assistance by Wells Fargo.

i. Defendant's actions of fraud and deceit directly and proximately caused financial and emotional damages to Plaintiff.

## COUNT 28
### PUNITIVE DAMAGES – ALAN HAYDEN

211. Plaintiff Hayden realleges the foregoing allegations and further alleges:

212. The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

213. The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees. Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to her detriment. Defendant's conduct in deceiving and causing significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

## COUNT 29
### COMMON TO ALL PLAINTIFFS COLLECTIVELY:
### VIOLATION OF THE FAIR CREDIT REPORTING ACT

214. Plaintiffs reallege all foregoing allegations, and further allege:

215. Defendant Wells Fargo Bank, N.A., in violation of 15 U.S.C.A. § 1681, et seq. of the Fair Credit Reporting Act ("FCRA"), failed to comply with the procedural protections and requirements of the FCRA when it used the consumer reports of Plaintiffs, and hundreds of other employees, to make adverse employment decisions resulting in their termination.

216. The FCRA imposes on employers that use a background check, or

other consumer report regarding an employee or job applicant, several important procedural requirements designed to protect consumers like the Plaintiffs in this case.

217.   Years after hiring Plaintiffs, Defendant ordered a background checks on all employees, which constitute consumer reports, from First Advantage Background Services Corp. ("First Advantage"), which is a consumer reporting agency.

218.   The consumer reports regarding Plaintiffs were obtained pursuant to Wells Fargo's Background Checks Project, and was not requested or used in connection with any investigation of any law, regulation, or policy, or any investigation of suspected misconduct on the part of Plaintiffs who had been diligently and competently performing their employment for Defendant for numerous years.

219.   First Advantage was and is a "consumer reporting agency" as defined in 15 U.S.C.A. § 1681(f).

220.   First Advantage was and is engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C.A. § 1681(d), to third parties such as Wells Fargo.

221.   First Advantage is not related by common ownership or affiliated by corporate control with Defendant.

222.   Defendant used the consumer reports it ordered from First

Advantage to make an adverse employment decisions with regard to Plaintiffs and to terminate Plaintiffs.

223. In doing so, Defendant failed to comply with the procedural protections and requirements imposed by the FCRA.

224. Specifically, Defendant failed to provide clear and conspicuous written disclosures in a document that consists solely of that disclosure to Plaintiffs, that a consumer report may be obtained for employment purposes.

225. Defendant further failed to obtain a valid authorization to procure consumer reports for employment purposes from Plaintiffs.

226. Defendant further failed to provide Plaintiffs with the required notice and a copy of the consumer report upon which it based its decision to take adverse employment action against Plaintiffs, within the time frames required under the FCRA.

227. Defendant further failed to provide Plaintiffs with a written summary of their FCRA rights prior to taking adverse employment action against them.

228. Defendant terminated Plaintiffs without providing any advance notice of such adverse action.

229. The consumer reports regarding Plaintiffs were provided to Wells Fargo pursuant to Wells Fargo's contract and "Scope of Work" with First Advantage.

230. Wells Fargo delegated entirely to First Advantage, its duty to

provide the notice and authorization form to Plaintiffs as mandated by 15 U.S.C.A. § 1681b(b)(2).

231.  Specifically, it was Wells Fargo's standard policy to direct employees such as Plaintiffs to the First Advantage website or portal, where applicants were required to authorize Wells Fargo's use of their First Advantage report using an electronic version of First Advantage's standard form.

232.  First Advantage's standard form did not comply with 15 U.S.C.A. § 1681b(b)(2) because it did not include a stand-alone document consisting only of the disclosure and authorization as required.

233.  Despite this failure, on or about April 2011, Defendant ordered for purchase an employment-purposed background check concerning Plaintiffs from First Advantage.

234.  The reports that Wells Fargo ordered and purchased from First Advantage were criminal background checks that contained a host of information unrelated to the parties and to Plaintiffs' performance as employees.

235.  Upon information and belief it was/is Defendant's standard practice to rely on consumer reports as a basis to fire employees on the spot without giving them proper written advance notice of such adverse action, without first providing them with a copy of their consumer report, and without providing them with a summary of their rights under the FCRA before taking adverse action.

236.  Upon information and belief it was/is Defendant's standard

practice to use a wordy disclosure, for purposes of FCRA-required notice and authorization, which is not contained in a stand-alone document consisting solely of the disclosure, as required by the FCRA.

237.   Defendant knew, or should have known, about its legal obligations under the FCRA because these obligations are well established in the plain language of the FCRA and in the promulgations of the Federal Trade Commission.

238.   Defendant had access to substantial written materials which apprised it of its duties under the FCRA.

239.   To ensure knowing compliance with the FCRA, Congress requires that before any consumer reporting agency may provide consumer reports on an applicant, the reporting agency must have obtained a certification from the employer that it will comply with 15 U.S.C.A. § 1681(b)(3) whenever the employer decides to take adverse action based in whole or in part on the consumer report.

240.   Upon information and belief, Defendant knowingly executed a certification with regard to Plaintiffs, providing that it would comply with the various provisions of the FCRA whenever adverse action was contemplated or taken based in whole or in part on information contained in his consumer report.

241.   Despite its certification, Defendant knowingly violated 15 U.S.C.A. § 1681b(b)(3).

242.   Despite knowing of these legal obligations, Defendant acted

consciously, in breaching its known duties and depriving Plaintiffs of their rights under the FCRA.

243.   As a result of these violations of Plaintiffs' rights, Defendant is liable to Plaintiffs for statutory damages from $100.00 to $1,000.00 pursuant to 15 U.S.C.A. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C.A. § 1681n(a)(2) for the violations alleged herein, and for attorney's fees and costs pursuant to § 1681n and § 1681o.

### COUNT 30
### COMMON TO ALL PLAINTIFFS COLLECTIVELY:
### VIOLATION OF RACKETEER INFLUENCED CORRUPT
### ORGANIZATIONS ACT

244.   Plaintiffs realleges the allegations contained in the paragraphs set forth above and further allege:

### FACTUAL BACKGROUND

245.   In January 2011, Wells Fargo implemented a new employee background screening program, "WFHM HR Background Checks Project."

246.   Wells Fargo had previously screened the backgrounds of all of its employees, including Plaintiffs, prior to initial hire.

247.   Wells Fargo represented to Plaintiffs and employees across all sectors of its operations that the new background checks were necessary in order to comply with new federal regulation, including "compliance with SAFE," and that all employees were required to consent to fingerprinting.

248.   The Secure and Fair Enforcement for Mortgage Licensing Act (SAFE Act) applied only to mortgage loan originators ("MLOs").

249.   Hundreds of Wells Fargo employees, who were rescreened pursuant to the Background Checks Project, were not MLOs and had no relation whatsoever to the SAFE Act.

250.   Plaintiffs, along with at least hundreds of other employees, received notification that pursuant to the new screening, "a record was found making you ineligible for employment with Wells Fargo."

251.   Plaintiffs and thousands of fellow employees were abruptly fired by Wells Fargo.

252.   The SAFE Act does not require banks to fire employees with background convictions.

253.   Wells Fargo later represented to Plaintiffs that they had been terminated pursuant to FIRREA/the FDI Act (codified as 18 U.S.C.A 1829), not "in compliance with SAFE," as Wells Fargo had represented earlier.

254.   The FDI Act was enacted in 1950, decades prior to the *hire* of Plaintiffs (or any of the employees fired in 2011 and after, under the auspices of SAFE).

255.   The FDI Act imposed a duty upon FDIC-insured banking institutions, including Wells Fargo, to seek FDIC consent *prior to hiring and employing* persons with certain convictions.

256.   The consent requirement allows the FDIC to assess the relative degree of risk posed by the potential employee to the insurability of the institution, particularly for persons involved in management and control of the institution.

257.    The FDIC stated in its 1998 Statement of Policy, detailing and establishing the requirements of its consent, that "an individual should generally not be prohibited from participating in banking because of a singular offense of lesser consequence."

258.    Nevertheless, Wells Fargo's affirmative policy was to ignore its duty, as an FDIC insured banking institution, under the FDI Act of 1950/ 18 U.S.C.A 1829 which required Wells Fargo to seek FDIC consent prior to hiring or employing such individuals.

259.    Wells Fargo arbitrarily hired and employed persons who disclosed prior convictions, without seeking FDIC consent, because "[d]isclosures of convictions on employment applications submitted to Wells Fargo do not automatically disqualify applicants from hire if a background check confirms they are eligible for employment."

260.    Numerous employees including Plaintiffs, who were terminated amid Wells Fargo's Background Checks Project in 2011 and after, had fully disclosed prior convictions of lesser consequence to Wells Fargo, had undergone background checks, and had been assured by Wells Fargo that their background records presented no obstacle to employment.

261.    Wells Fargo did not seek or secure FDIC consent waivers for these employees.

262.    Wells Fargo did not inform these employees of the FDIC waivers, or Wells Fargo's duty to seek FDIC consent upon notice of a conviction.

263.    Plaintiffs acted in reliance on Wells Fargo's assurance that their prior convictions were not an obstacle to employment, passed on other lucrative opportunities, and importantly, joined Wells Fargo in lieu of other business opportunities.

264.    Wells Fargo also did not seek or secure FDIC consent prior to hiring or employing Plaintiffs and did not inform Plaintiffs of its duty to do so.

265.    Wells Fargo admitted in Iowa Civil Rights Complaint proceedings (generated against Wells Fargo in response to its Background Checks Project) that the employee background re-screening and termination project it initiated in 2011 was actually a "business decision", not required by law as they represented to employees.

266.    Wells Fargo represented to Plaintiffs, its other employees, the media, and the public that its employees were "disqualified by Section 19" (of the FDI Act/ 18 U.S.C.A 1829) and that Wells Fargo had "no choice" but to terminate hundreds of employees.

267.    Wells Fargo represented that it had no choice because "the FDIC strictly interprets the purposes and reach of Section 19."

268.    The law requires only that Wells Fargo and other banking institutions seek FDIC consent, prior to hiring employees with disqualifying criminal records, effectively clearing such employees for work.

269.    The law by the terms of the FDIC's 1998 Statement of Policy, requires that "[u]pon notice of a conviction" an FDIC consent waiver *"must be filed."*

270.    Wells Fargo did not file an FDIC consent waiver subsequent to recruiting Plaintiffs, or prior to hiring and employing Plaintiffs for over three years, despite full knowledge of their prior conviction.

271.    Upon information and belief, Wells Fargo did not file an FDIC consent waiver prior to or subsequent to employment of persons, including Plaintiffs, who fully disclosed minor background convictions to Wells Fargo at the time of their hire.

272.    Wells Fargo wrongfully and maliciously failed to comply with the requirements of Section 19/ 18 U.S.C.A 1829 (securing FDIC consent) on the **sole** basis that it was "not its policy or practice to do so."

273.    Wells Fargo also wrongfully and maliciously failed to tell Plaintiffs and hundreds of other employees whom it fired that compliance with 18 U.S.C.A. 1829, i.e. securing an FDIC consent waiver, was all that was needed to remove any potential obstacle to their employment (regarding Section 19).

274.    Wells Fargo wrongfully and maliciously failed to tell Plaintiffs and hundreds of other employees whom it fired that "[t]he FDIC does not view Section 19 as punitive" and "FDIC policy is to approve [such] application[s]."

275.    Within months after Wells Fargo began terminating employees en masse pursuant to its Background Checks Project, and under the auspices of compliance with federal regulation, the FDIC expanded its "de minimis" offenses category, in order to automatically waive the consent requirement with regard to a widening pool of minor convictions.

276.    The FDIC issued a Financial Institution Letter to every FDIC-insured institution, announcing that "[c]larification of the criteria is expected to **reduce** the number of Section 19 applications and regulatory burden."

277.    Wells Fargo failed to consult with the FDIC, and failed to halt or curb its mass termination project.

278.    The FDIC *again* expanded its de minimis offenses category to automatically waive the consent requirement with regard to even more employees and issued another Financial Institution Letter to every FDIC-insured institution advising of the further expansion.

279.    Under the auspices of SAFE/Section 19 compliance, Wells Fargo maliciously fired Plaintiffs, and other employees, who were never convicted of anything, whose convictions were diverted or expunged, or whose convictions did not require any FDIC consent or waiver at all.

280.    Wells Fargo maliciously failed to inform its own managers, who were tasked with firing the hundreds of employees, about the FDIC consent waivers.

281.    Wells Fargo explicitly instructed the operative group for the Background Checks Project **not** to share this information, or the fact that the Project was actually a "business decision," with lower level management and rank-and-file employees.

282.    Pursuant to the Background Checks Project, Wells Fargo abruptly

fired hundreds of exemplary employees, some of whom had worked for Wells Fargo for decades and were approaching retirement, others who had just received promotions or had bonuses forthcoming.

283.   Pursuant to the Background Checks Project, Wells Fargo denied these employees severance pay and unemployment benefits, and in many cases withheld earned bonuses and accrued leave compensation.

284.   Wells Fargo selectively revealed the information about the FDIC consent waivers to certain employees whom it preferred to retain, and even selectively offered suspended employment with no break in benefits while an FDIC consent waiver was sought.

285.   Some of Wells Fargo's employees found out about the waivers independently or by hiring an attorney, and sought and secured an FDIC consent waiver on their own.

286.   When the employees who succeeded in securing FDIC clearance on their own contacted Wells Fargo about reinstating their employment, Wells Fargo either refused to re-hire by continuing to claim ineligibility, or re-hired them as new hires, with corresponding pay reduction, and stripped of all seniority and prior accrued benefits.

287.   No other FDIC-insured banking institution engaged in mass employee termination under the auspices of "compliance" with the SAFE Act, Section 19, or any related federal regulation.

288.   Many of Wells Fargo's former employees left banking permanently,

under the residual impression from their experiences at Wells Fargo that they were "unemployable" in banking.

289.   Other former Wells Fargo employees, despite the shame and humiliation of being fired with the inference of dishonesty and criminal behavior, began new careers at other FDIC-insured banking institutions and have never since, notwithstanding full disclosure, had an issue with old or expunged convictions.

### A.   RICO Allegations - The Enterprise

290.   Defendant is a person within the meaning of Title 18 U.S.C.A. § 1961(3), of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C.A. § 1961-1968).

291.   At all relevant times, and in violation of 18 U.S.C.A. § 1962(c), Defendant conducted the affairs of an association-in-fact enterprise, as that term is defined in 18 U.S.C.A. § 1961(4).

292.   Upon information and belief, the enterprise which was contrived and employed by corporate Defendant Wells Fargo Bank, N.A. was known as the Background Checks Project, and its affairs affected interstate commerce through a pattern of racketeering activity.  In addition, a higher-level group of Wells Fargo employees, also known as the decision-making/working group, gave instructions and orders to the Background Checks Project Executive Sponsor, Pete DeLanoit.  Upon information and belief, the decision-making/working group, along with Pete DeLanoit, included D. Bialzok, Scott Murphy, and Bill Hunnicutt.

293.  Wells Fargo's enterprise was an on-going, continuing group or unit of persons and entities associated informally together for the common purpose of terminating employees in mass, reducing payroll, eliminating earned and accrued employee bonuses and benefits, and depressing the relevant job-market, under the fraudulent pretext of compliance with federal regulation.

294.  Additional individual members of The Background Checks Project Enterprise and decision-making/working group named in paragraph 292 above, consisted of high-level directing and managing employees of Wells Fargo, including those in the Human Resources Policy and Corporate Employee Relations divisions, along with Wells Fargo's third-party background screening vendor First Advantages Background Services, who associated through the enterprise for the purposes of fraudulently maximizing Wells Fargo's corporate profits at the expense of its employee workforce.

295.  Upon information and belief, the individual persons employed by Wells Fargo who comprised the association-in-fact enterprise and conducted its affairs through a pattern of racketeering activity, include the following:

> The decision-making/working group, including Pete DeLanoit, D. Bialzok, Scott Murphy, and Bill Hunnicutt; Anna Brewer, "Compliance Consultant/Specialist;" Genara Burnett, "Financial Crimes Specialist;" Martha Ferrer, "Compliance Consultant;" Lashelle Foster, "Compliance Consultant;" Lisa Jackson, "Compliance Consultant;" Tomeka James, "Compliance Consultant;" Esther Bush, "Temporary Employee;" Page Lankaster, "Temporary Employee;" Kelly McDermott, "Temporary Employee;" Dwayne Phelps, "Temporary Employee;" Francisco Valadez, "Temporary Employee;" Cindy Blais, "Compliance Consultant;" Paulette Brooks, "Compliance Consultant;" Deb Mitchell, "ER Consultant;" Ashley Sanders, "Compliance Consultant;" Greg Gates, "ER Consultant;" Katie Johnson, "ER Consultant;" Cha Sanders, "ER Consultant;" Kathi Taga, "ER Consultant."

296.  It is believed that a number of the foregoing names, which consist of individual members of the association-in-fact, were hired temporarily by Defendant for the specific purpose of conducting the affairs of the enterprise.

297.  Defendant's association-in-fact also included third-party vendor First Advantage Background Services, which Defendant utilized and conspired with to conduct the purposes of the enterprise by engaging in rampant and wide-spread violations of the Fair Credit Reporting Act, in pursuit of "disqualifying" criminal background records.

298.  Defendant through its Background Checks Project enterprise, along with and including third-party vendor First Advantage Background Services, willfully ignored the protections established under the FCRA prohibiting the reporting of outdated records and requiring adequate notice and authorization for the adverse use of such records, in order to accomplish the mass employee termination objectives of the enterprise.

299.  Defendant's association-in-fact enterprise alternately engaged in the legitimate business activity of conducting background screening on potential, and existing, Wells Fargo employees and maintained a discrete existence, behind a façade of compliance with federal regulation in conducting its employee termination function.

300.  Defendant Wells Fargo Bank, N.A. directed, participated in, and was part of the Background Checks Project, while also having an existence separate and distinct from the enterprise, through which it conducted its legitimate business and banking activities.

301.   The Background Checks Project was formed some time before or during 2011 and continued its operations at least into 2013.

**B.    RICO Allegations - Association with and Participation in the Conduct of The Enterprise's Affairs**

302.   Defendant Wells Fargo Bank, N.A., in violation of 18 U.S.C.A. § 1962(c) of the RICO Act, established, directed, and fulfilled the fraudulent objectives of the enterprise, the Background Checks Project, through development and implementation of high-level confidential and fraudulent corporate policy and directives, and through the actions of individual directors, operative employees, and its third-party vendor, tasked with carrying out the fraudulent administrative and active functions of the enterprise.

**C.    RICO Allegations - The Predicate Acts**

303.   Defendant Wells Fargo Bank, N.A., in violation of 18 U.S.C.A. § 1961(1)(B) of the RICO Act, engaged in multiple predicate offenses of mail and wire fraud, in violation of the federal mail and wire fraud statutes (18 U.S.C.A. § 1341 and § 1343 respectively), in carrying out the above described employee termination scheme.

304.   Defendant used the mails and wires to induce Plaintiff and other employees who fully disclosed convictions to accept employment with Wells Fargo without securing prior FDIC consent as mandated by federal law, without informing employees of the possibility that FDIC consent might be required prior to their employment, and/or without informing employees of their option to secure FDIC consent on their own, which would allow them to work without issue in banking.

305. Defendant used the mails and wires to create and implement the objectives of the Background Checks Project enterprise, to falsely represent that all of its employees were subject to new requirements under the SAFE Act and/or the FDI Act, and to falsely represent that all employees were required thereby to submit to new fingerprinting and background screening.

306. Defendant, along with its agents and subcontractors including third-party vendor First Advantage Background Services, used the mails and wires to willfully violate the Fair Credit Reporting Act without proper authorization as required, and with regard to the reporting of outdated consumer reports, and directing adverse employment decisions without proper notice to its employees.

307. Defendant used the mails and wires to direct the fraudulent "eligibility" determinations and terminations of hundreds of Wells Fargo employees, and to advise and misrepresent that employees' only recourse was to contact First Advantage to dispute the existence of any criminal record.

308. Defendant used the mails and wires in furtherance of its scheme by creating mails to Plaintiffs, en mass to its lower level employees, to attorneys representing its terminated employees, to the offices of various political entities inquiring on behalf of terminated employees, and to the media, making affirmative fraudulent representations that Wells Fargo was required by federal regulation to abruptly and irreversibly terminate hundreds if not thousands of employees.

309. Defendant used the mails and wires to deliberately conceal and

omit material facts to Plaintiffs, en mass to its lower level employees, to its own lower level management, to attorneys representing its terminated employees, to the offices of various political entities inquiring on behalf of terminated employees, and to the media, furthering the fraudulent impression that Defendant's conduct was required under federal law, that Defendant had "no choice" but to fire hundreds of employees, and that there was nothing that could be done to salvage the positions, accrued employment benefits, and reputations of employees who worked diligently and to the benefit of Wells Fargo for years.

310.  Defendant's superior knowledge of the federal regulatory background, as an FDIC-insured banking institution, one of the largest banks in the world, an active participant in the development of public policy and federal banking regulations, a recipient of all FDIC-insured banking institution communications released by the FDIC in regard to FDIC and federal banking regulation, and an active participant in current banking community events and dialogue, resulted in a justifiable reliance by Plaintiffs, the thousands of other Wells Fargo employees, and the larger community, on the fraudulent and deceitful representations made by Wells Fargo through the use of the mails and wires.

311.  Defendant's fiduciary relationship to Plaintiffs and its other employees, as the custodian of earned employment benefits such as paid vacation time, earned bonuses, and vested retirement packages, pursuant to the terms of Wells Fargo's Employee Handbook, resulted in a justifiable

reliance by Wells Fargo employees on the fraudulent and deceitful representations made by Wells Fargo through the use of the mails and wires.

312.  Defendant's special relationship of trust and confidence to Plaintiffs and other employees who fully disclosed prior background convictions at the time of hire, resulted in a justifiable reliance on Wells Fargo's fraudulent representations, through the mails and wires, that the convictions would pose no obstacle to employment.

313.  Defendant's special relationship of trust and confidence to employees who specifically inquired of Wells Fargo, as their employer, whether there was anything they could do to save their careers, resulted in a justifiable reliance on Wells Fargo's fraudulent representations, through the mails and wires, that they were "unemployable" and Wells Fargo had "no choice" but to fire them.

314.  Defendant's special relationship of trust and confidence to Plaintiffs who declined other career paths in response to career promises from Wells Fargo; resulted in a justifiable reliance on Wells Fargo's fraudulent and deceitful representations through the use of the mails and wires.

### D.    RICO Allegations - A Pattern of Racketeering Activity

315.  Upon information and belief, Wells Fargo developed its association-in-fact for the conduct of the Background Checks Project sometime during or before 2011 and continued its racketeering activities, through the enterprise, at least well into 2013, sending thousands of fraudulent communications through

the mails and wires during that time, and affecting the corresponding terminations of Plaintiffs and hundreds if not thousands of its other employees.

316. All of the aforementioned acts of racketeering activity were undertaken for the common purpose of massive payroll reduction and maximization of profits at the expense of Wells Fargo's employee workforce, by fraudulently terminating hundreds of employees and swindling them out of accrued and forthcoming employment benefits.

317. All of the aforementioned acts of racketeering activity exhibited blatant and repeated fraud over a period of several years under the auspices of "compliance" with federal regulation and pose an unchecked threat of repetition in the future.

### E.   RICO Allegations - Causation and Damages to Plaintiffs

318. Wells Fargo's termination scheme, as described above, directly caused loss of employment to Plaintiffs and hundreds of other employees, not only at Wells Fargo but in the larger banking industry as a result of reputational damage, loss of career opportunity, job market depression, loss of accrued and forthcoming employment benefits, and in Plaintiffs' case, loss of valuable personal business assets.

319. As a direct result of Wells Fargo's employee termination scheme many employees suffered the expense of hiring attorneys in an attempt to save their careers, the additional loss of 401K savings which they were forced to access when they were fired and denied unemployment benefits by Wells Fargo, and additional heavy tax penalties on their premature savings withdrawals.

320.   As a result of Defendant's injury to Plaintiffs' business and property, by reason of Defendant's violation of 18 U.S.C.A. § 1962, Defendant is liable to Plaintiffs for statutory damages in treble the amount of such actual and punitive damages as were caused to Plaintiffs, for reasonable attorney's fees and expenses, and for Plaintiffs' costs incurred herein, pursuant to 18 U.S.C.A. § 1964.

WHEREFORE, Plaintiffs pray for the following relief:

1. A determination that Defendant's conduct was fraudulent and caused Plaintiff damages;

2. An award of all detrimental damages as a result of Defendant's fraudulent conduct including, but not limited to damages resulting from emotional distress, loss of enjoyment of life, loss of income, and mental anguish;

3. An award of compensatory damages;

4. An award of punitive damages;

5. Attorney's fees and costs; and

6. Such other and further relief as this Court may deem just and proper.

Plaintiffs further pray for the following relief under the provisions of 15 U.S.C.A. § 1681:

1. A determination that Defendant committed multiple separate willful violations of Plaintiff's rights under the FCRA.

2. That judgment be entered for Plaintiff and against Defendant for statutory and punitive damages, attorney's fees, expenses, and costs, pre and post-judgment interest, and such other relief as the Court considers just and proper.

Plaintiffs further pray for the following relief under the provisions

of 18 U.S.C.A § 1964(c):

1. A determination that Defendant, through its association-in-fact, conducted the affairs of a racketeering enterprise, the Background Checks Project, through a pattern of racketeering activities affecting interstate commerce and in violation of the RICO Act.

2. That judgment be entered for Plaintiffs and against Defendant for treble the amount of such actual and punitive damages as are fair and reasonable, for Plaintiffs' reasonable attorney's fees and expenses, for Plaintiffs' costs incurred herein, and for such further relief as the Court considers just and proper.

Dated this 2nd day of February, 2017.

BEARDSLEY, JENSEN & LEE, Prof. L.L.C.

By: _____
Steven C. Beardsley
Michael S. Beardsley
4200 Beach Drive, Suite 3
P.O. Box 9579
Rapid City, SD  57709
Telephone:  (605) 721-2800
Facsimile:  (605) 721-2801
Email:  sbeards@blackhillslaw.com
mbeardsley@blackhillslaw.com
*Attorneys for Plaintiffs*

**DEMAND FOR JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs

demand a jury trial of all their claims.

_____
Steven C. Beardsley

64